**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Anthony ANTONE, Manuel Gispert, Larry Neil Miller, Frank Diecidue, a/k/a "The Under Boss," Frank Boni, Jr., and Homer Rex Davis, Defendants-Appellants.**

No. 78–1614.

United States Court of Appeals,
Fifth Circuit.

Oct. 1, 1979.

Robert W. Knight, Federal Public Defender, Tampa, Fla., for Antone.

B. Anderson Mitcham, Tampa, Fla. (Court-appointed), for Gispert.

George D. Gold, Miami, Fla., for Boni.

James O. Brecher, Jacksonville, Fla. (Court-appointed), for Miller.

Paul Antinori, Jr., Tampa, Fla., for Diecidue.

Henry Gonzalez, James L. Arnold, Tampa, Fla., for Davis.

Katherine Winfree, Appellate Sect., Crim. Div., Sidney M. Glazer, Atty., U.S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before GODBOLD, SIMPSON and RONEY, Circuit Judges.

RONEY, Circuit Judge:

While appeals from convictions for various offenses were pending, *see United States v. Diecidue,* 603 F.2d 535 (5th Cir. 1979), defendants were made aware of false testimony by the principal Government witness and moved for a new trial. We remanded to the district court where their motion was denied. On appeal, defendants argue that a false statement which covered up the fact that attorney's fees of the witness were being paid by the State of Florida was sufficiently material in its bearing upon the credibility of the witness to warrant a new trial. The district court determined that the truth about the payment of attorney's fees could not reasonably have affected the outcome. We affirm.

This appeal arose as a result of answers given by Marlow Haskew, the Government's principal witness, during cross-examination:

[By Mr. Hogan, a defense attorney]

Q. Mr. Haskew, I don't want to belabor the agreement you made with the federal government in exchange for your testimony, because we've been over that, but there are a couple of things I'd like to go into. Did you hire an attorney to represent you?

A. Yes, I did.

Q. Have you paid him with your own funds?

A. Yes, sir.

This testimony was false. The Assistant United States Attorney who prosecuted the case was later informed by attorneys for the State of Florida that an internal investigation of the Florida Department of Criminal Law Enforcement [FDCLE] revealed that that department had paid Haskew's legal fees. The federal prosecutor promptly informed the court. Defendants moved for a new trial pursuant to Rule 33, Fed.R. Crim.P., on the basis of this newly discovered evidence and Haskew's further false testimony about whether he was in federal custody.

At the subsequent hearing it was revealed that a joint investigative task force composed of FBI agents and FDCLE agents was formed to solve the October 23, 1975 murder of former Tampa police officer Richard Cloud. On February 25, 1976, Haskew confessed to the murder. While Haskew was testifying before a state grand jury the next day, an attorney who claimed to represent him appeared outside the grand jury room and asked to speak with Haskew. Haskew denied that the lawyer represented him and refused to see him.

As a result of this incident, the investigative team expressed concern that an attempt had been made to "plant" a lawyer who would hamper the investigation by serving the interests of those against whom Haskew intended to testify. The discussion focused on the necessity of legal representation for Haskew which would not be subservient to these interests. FDCLE Agent First volunteered to "take care of that."

Agent First proceeded to obtain counsel for Haskew, assuming that he was indigent and unable to pay the fees himself. He contacted an Orlando attorney, W. Ford Duane, who agreed to represent Haskew upon the latter's approval. It was understood that Duane's fee would be paid by FDCLE. Approval of this arrangement was obtained from First's superior and the fee of $11,500 was paid in several cash disbursements made from an FDCLE confidential fund and drawn in First's name. These vouchers were not furnished to federal agents nor were they present in the FDCLE investigative files made available to the federal agents.

Consequently, only First and his immediate superiors knew of this arrangement. Haskew had been advised by Duane not to disclose the arrangement, and Duane himself did not do so. At one point, when questioned by state attorneys, Duane responded that the matter was not their business. First did not disclose the arrangement to the federal agents or prosecutors either.

■ A motion for new trial pursuant to Rule 33, Fed.R.Crim.P., is addressed to the sound discretion of the trial judge. *United States v. Riley*, 544 F.2d 237 (5th Cir. 1976), *cert. denied*, 430 U.S. 932, 97 S.Ct. 1554, 51 L.Ed.2d 777 (1977); *Hudson v. United States*, 387 F.2d 331 (5th Cir. 1967), *cert. denied*, 393 U.S. 876, 89 S.Ct. 172, 21 L.Ed.2d 147 (1968). Accordingly, the denial of such a motion will be reversed only where it is shown that the ruling was so clearly erroneous as to constitute an abuse of discretion. *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977); *United States v. Smith*, 433 F.2d 149, 151 (5th Cir. 1970).

■ In order to prevail upon a Rule 33 motion, a defendant must ordinarily show

(1) that the evidence was newly discovered and was unknown to the defendants at the time of the trial;

(2) that the evidence was material, not merely cumulative or impeaching;

(3) that it would probably produce an acquittal; and

(4) that failure to learn of the evidence was due to no lack of diligence on the part of the defendants.

*United States v. Rachal,* 473 F.2d 1338, 1343 (5th Cir.), *cert. denied,* 412 U.S. 927, 93 S.Ct. 2750, 37 L.Ed.2d 154 (1973). An exception exists, however, where it is shown that the Government's case included false testimony and the prosecution knew or should have known of the falsehood. The cases hold that in that event a new trial must be held if there was any reasonable likelihood that the false testimony would have affected the judgment of the jury.

A deliberate deception on the part of the prosecution by the presentation of known false evidence is not compatible with the "rudimentary demands of justice." *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), the Supreme Court held that the suppression by the state of evidence material to the case justifies a new trial "irrespective of the good faith or bad faith of the prosecution."

The scope of these cases was expanded by the Supreme Court in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In *Giglio* the principal Government witness testified that he had not been offered immunity from prosecution as an incentive to testify. It was subsequently revealed that a Government attorney had made such a promise to the witness in the preliminary stages of the investigation. Although the Government attorney who tried the case was unaware of this agreement, the Court held that the nondisclosure, whether stemming from negligence or design, was the responsibility of the prosecutor. Applying the materiality standard of *Brady, supra,* the Court required a new trial if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." *Giglio v. United States,* 405 U.S. at 154, 92 S.Ct. at 766, *quoting from Napue v. Illinois,* 360 U.S. at 271, 79 S.Ct. 1173.

The Government contends that the standard which has evolved through these cases should not be applied in the instant case. Instead, it argues that defendant should be required to prove that the evidence would probably result in acquittal. This contention is based upon the federal Government agents' lack of actual knowledge of the payment of Haskew's attorney's fees and the observation that inquiry by the prosecution as to the source of the fees would have been so highly unusual that Government negligence cannot be inferred.

Had the investigators been federal, their knowledge would have been imputed to the prosecution. In considering use of perjured testimony this Court has declined to draw a distinction between different agencies under the same government, focusing instead upon the "prosecution team" which includes both investigative and prosecutorial personnel. *See Schneider v. Estelle,* 552 F.2d 593, 595 (5th Cir. 1977); *Smith v. State of Florida,* 410 F.2d 1349, 1351 (5th Cir. 1969). *Cf. United States v. Deutsch,* 475 F.2d 55, 57 (5th Cir. 1973).

The success of the Government's argument, then, depends on a distinction between the federal forces and the state forces. The Government contends, in essence, that the knowledge of the state investigators should not be imputed to the federal prosecutor.

These arguments overlook the fact that the two governments, state and federal, pooled their investigative energies to a considerable extent. Even the meeting at which First volunteered to "take care of" the danger of a "planted" attorney was a joint meeting. The entire effort was marked by this spirit of cooperation and state officers were important witnesses in the federal prosecution.

We have discovered no case which addresses imputed knowledge in a situation where federal and state investigations and prosecutions overlap. Although the Government stresses the fact that the two represent entirely separate sovereigns, federal and state sovereignty overlap in many respects. Imposing a rigid distinction between federal and state agencies which have cooperated intimately from the outset of an investigation would artificially contort the determination of what is mandated by due process. Rather than endorse a *per se* rule, we prefer a case-by-case analysis of the extent of interaction and cooperation between the two governments.

In the instant case, extensive cooperation between the investigative agencies convinces us that the knowledge of the state team that Haskew's lawyer was paid from state funds must be imputed to the federal team. We have little difficulty in concluding that the state investigators functioned as agents of the federal government under the principles of agency law utilized in *Giglio.* The state agents were in a real sense members of the prosecutorial team.

Because the prosecution should have known of the falsehood, the standard to be applied is whether it is reasonably likely that the truth would have produced a different verdict. *Giglio v. United States*, 405 U.S. at 154, 92 S.Ct. 763. *See also United States v. Anderson*, 574 F.2d 1347, 1355–56 (5th Cir. 1978). The district court concluded that revelation of the fact that Haskew's attorney was paid by the state would not reasonably have affected the judgment of the jury. This finding is supported by the record.

The payment of attorney's fees goes to Haskew's credibility. The focus of inquiry is whether disclosure of this information would undermine his credibility so as to introduce an element of reasonable doubt.

Haskew's background was exposed to the jury in considerable detail. He admitted numerous felony convictions and a wide variety of other criminal acts. He admitted to having used addictive drugs, to having been treated for mental illness, and to having made prior inconsistent statements about matters which were the subject of his trial testimony. He admitted that he lied in the past in order to protect himself and that he had a personal bias against at least one of the defendants. The particulars of his plea bargains with the Government were admitted and he conceded that he was testifying in order to avoid the electric chair. Furthermore the Superintendent of the state penitentiary was allowed to testify that Haskew had a poor reputation for veracity. The significance of the Superintendent's testimony would not have been lost upon the jury because the state prison was the only community in which he had recently resided.

Notwithstanding the massive impeachment of Haskew, which took two days and occupies approximately 350 pages of the transcript, the jury believed his testimony. Presumably, this belief was based upon corroborative testimony from other witnesses as well as the fact that his testimony was substantiated on many points by tangible evidence.

It must be noted that payment of Haskew's lawyer was not a promise by which he was induced to testify. The terms of Haskew's plea arrangement were fully disclosed.

In any event, it was quite apparent to the jury that Haskew was motivated primarily by self-interest. The revelation that the attorney's fees were being paid by the state would not have been especially significant as it would only have further revealed Haskew's self-interest motivation, already amply shown.

In the face of this evidence, the trial court was not clearly erroneous in concluding that "[t]he circumstances surrounding the payment of Haskew's lawyer pale into total insignificance as impeachment when considered against the backdrop of all the other impeaching evidence the jury had before it." *See United States v. Minichiello*, 510 F.2d 576, 578 (5th Cir. 1975).

The cases upon which defendants rely are not controlling because in each the false testimony had a far more serious impact. *United States v. Sanfilippo*, 564 F.2d 176 (5th Cir. 1977); *Blankenship v. Estelle*, 545 F.2d 510 (5th Cir. 1977); *Dupart v. United States*, 541 F.2d 1148 (5th Cir. 1976); *United States v. Librach*, 520 F.2d 550 (8th Cir. 1975), *cert. denied*, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976); *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842 (4th Cir. 1964); *Nash v. Purdy*, 283 F.Supp. 837 (S.D.Fla.1968). In *Sanfilippo*, the witness testified falsely as to two conditions of his plea bargain, concealing the fact that his testimony was motivated by an outstanding indictment against him. A witness' testimony created the false impression that the Government had not promised to dismiss pending charges in *Blankenship* and that there were no pending charges at all in *Dupart*. In *Barbee*, the prosecution failed to disclose tests which showed that a revolver different from defendant's was used in committing the crime. In *Librach*, the Government failed to reveal that a crucial witness was being held in protective custody and paid subsistence payments. Likewise in *Nash*, the state suppressed testimony from a critical witness that defendant was innocent. Unlike the serious falsifications in these cases, the falsification about the attorney's fees in the instant case is immaterial when viewed in the context of the entire record.

Defendants also assert that Haskew made a false statement when asked whether he was in federal custody. The dialogue complained of is as follows:

Q. Mr. Haskew, are you now and have you been in the custody of the federal authorities since your interview and confession and statement on February the 25th, 1976?

A. No, sir.

In fact at the time of the trial Haskew was in federal protective custody and had been in federal custody since April 30, 1976. It does not appear that Haskew's answer was false. Haskew was *not* held in federal custody since his arrest on February 25, 1976. Since the statement is not false, the motion for a new trial based on this statement must be assessed under the more rigorous standard set forth in *United States v. Rachal*, 473 F.2d at 1343. Because the evidence of Haskew's federal detention was well known at the time of the trial, defendants' argument fails to meet even the first prong of this test, that is, that the "newly discovered" evidence was unknown to defendants at trial. The trial court, therefore, properly concluded that this statement does not warrant a new trial.

AFFIRMED.