**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0465n.06

Case No. 11-6180

**FILED**
Jun 23, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| GARY WAYNE SUTTON, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| WAYNE CARPENTER, Warden, | ) | TENNESSEE |
| | ) | |
| Respondent-Appellee. | ) | |

BEFORE: BOGGS, GIBBONS, and COOK, Circuit Judges.

COOK, Circuit Judge. Gary Wayne Sutton, a Tennessee prisoner sentenced to death, appeals the district court's denial of his petition for a writ of habeas corpus filed under 28 U.S.C. § 2254. We review two claims certified for appeal: (1) Sutton's *Brady* claim that the state withheld evidence that could be used to impeach its time-of-death rebuttal witness; and (2) Sutton's ineffective-assistance-of-counsel claim that trial counsel conducted an inadequate investigation and presented insufficient mitigating evidence of Sutton's family background at sentencing. Finding no reversible error in the district court's rejection of these claims, we AFFIRM.

I.

*A. Trial & Sentencing*

The state prosecuted Sutton and his uncle, James Dellinger, for murdering their mutual friend, Tommy Griffin, and Griffin's sister, Connie Branam, in February 1992. After joint trials, juries convicted Sutton and Dellinger for both murders. This habeas proceeding arises from Sutton's conviction for Griffin's murder.

The state relied on circumstantial evidence to convict Dellinger and Sutton. The two defendants met Griffin at Howie's Hideaway Lounge in Maryville, Tennessee, on the afternoon of February 21, 1992. According to the prosecution, what began as an afternoon of drinking and pool between friends devolved into a road-side fight, Griffin's arrest for public intoxication, the burning of Griffin's trailer, and Griffin's disappearance following his release from jail. The evidence supported the following timeline of events: officers booked Griffin at 7:40 p.m.; Dellinger visited the jail forty-five minutes to an hour later to ask about Griffin's release; the officers told Dellinger about the department's four-hour detention policy for public-intoxication arrests; and then Dellinger returned with Sutton around 11:30 p.m. and bailed Griffin out of jail. Meanwhile, at around 9 p.m.—between Dellinger's visits to the jail—a neighbor saw Griffin's trailer catch fire moments after seeing Dellinger's white truck speed by with two occupants. Griffin's niece, Jennifer Branam, went to Dellinger's trailer to ask about her uncle and, after a brief chat, asked Sutton and Dellinger to accompany her to Griffin's trailer. The men declined, with Dellinger responding to the effect that they were already in enough trouble. Looking through her window after returning home, Branam saw Dellinger move a sheet-wrapped object that "resembled a shotgun" from his truck to the back of his wife's Oldsmobile. Sutton and

Dellinger left the trailer park in that car around 10 p.m. *See State v. Dellinger*, 79 S.W.3d 458, 462–65 (Tenn. 2002).

No one saw Griffin after his release at 11:30 p.m. but, approximately twenty minutes after he left the station with Sutton and Dellinger, witnesses heard gunshots near the Blue Hole area of Little River. Three days later, passersby found Griffin's body on the banks of Blue Hole, the victim of a gunshot wound to the head. Forensics linked 12-gauge shotgun shells lying next to Griffin's body to shells found in Dellinger's yard. *Id.*

Connie Branam set out looking for her missing brother with Sutton and Dellinger on the afternoon of February 22. They stopped at the bar to ask about Griffin. Later that night, witnesses observed a fire in the woods near the Clear Fork area of Sevier County. A white truck with two passengers was spotted leaving those woods the following morning. Six days later, authorities found Connie Branam's body, burned in her car, in the same wooded area. Investigators tied a rifle shell found in her car to a .303 rifle found in Dellinger's trailer. *Id.* at 464–65.

Relevant to this habeas petition, both the prosecution and the defense relied on time-of-death evidence. The State attempted to prove that Griffin died on the night of February 21 while still in the company of Dellinger and Sutton, and Sutton tried to prove otherwise. The district court's opinion succinctly explains the time-of-death controversy.

> Dr. Eric Patrick Ellington ("Dr. Ellington"), the pathologist who conducted the autopsy on the remains of Griffin on February 25, 1992 testified that he does not make time-of-death determinations. Therefore, he did not provide a time of death. Dr. Ellington also clarified that the date on his report—February 24, 1992—was the date the body was discovered, and not the date or time of death. Although Dr. Ellington did not make a time-of-death determination, he was questioned about the factors that are considered when making such

determinations. He explained that rigor mortis begins somewhere within 30 minutes to an hour after death and lasts up to 24 to 36 hours and then goes away. He specifically clarified that the time frames are not strict, but are an average length of time and are dependent on the ambient temperature and climatic conditions to which the body is exposed. Other facts which assist in determining the time of death, Dr. Ellington explained, are core body temperature, chemical test results on eyeball fluid, and the presence or absence of the stage of insect larvae. Dr. Ellington did not observe any injuries to Griffin's body which could be attributed to carrion eaters or carnivores, did not take or have taken the core body temperature, and did not order any chemical tests performed on the fluid from the eyeball.

Dr. Ellington then detailed some of his autopsy findings. Griffin's pancreas had gross features of autolysis, meaning it had started to digest itself which happens shortly after death occurs. Both of Griffin's lungs, his left adrenal gland, and his liver showed signs of decomposition, with the latter organ being more extensively decomposed and containing cystic areas which did not appear to be a postmortem change. Dr. Ellington also pointed out that the rate of decomposition is variable—the colder the climate the slower the rate of decomposition.

The defense presented Dr. Larry Elmo Wolfe ("Dr. Wolfe"), the medical examiner and coroner in Union County, as its expert to testify about the victim's time-of-death. Dr. Wolfe, a licensed medical doctor, though not board certified in any field of medicine, testified that Griffin died 24 to 36 hours before his body was discovered, thus placing his time of death between 3:00 a.m. and 3:00 p.m. Sunday February 23, 1991. But the doctor conceded that, conceivably, Griffin died on Friday when the shots were heard.

The State did not present any expert-time-of-death testimony during its case-in-chief given Dr. Ellington's reluctance to determine a time of death, and the disqualification of its intended expert on the subject, Dr. Cleland Blake, due to a conflict of interest. Rather, on rebuttal, the State combated Dr. Wolfe's estimate as to the time of death by presenting the testimony of Dr. Charles Harlan ("Dr. Harlan") as to that issue.

Dr. Harlan, a board-certified forensic pathologist, testified that he considered the reports from the first responders, the autopsy report, the photographs, the tissues on the microscopic slides, and the fact the victim was last seen alive around 11:30 p.m. on Friday, February 21, 1992, and estimated that Griffin died between 11:30 p.m. on Friday, February 21, 1992 and 8:00 a.m. on Saturday, February 22, 1992.

During closing argument, the prosecution touted Dr. Harlan's credentials and forensic experience as superior to those of Dr. Wolfe, who lacked training in pathology. The jury convicted Dellinger and Sutton.

During the penalty phase of his trial, Sutton's counsel presented evidence of Sutton's employment history, his good behavior during a previous period of imprisonment, his parents' divorce, and his reputation as a good family man who rescued his niece from a fire and supported his sister-in-law's family while she recovered from surgery. A clinical psychologist also testified that Sutton dropped out of school in the eighth grade; had a low IQ; abused alcohol from an early age; and suffered mental and physical abuse as a child, stemming from his parents' rocky relationship. Despite this mitigating evidence, the jury found sufficient aggravating circumstances under Tennessee law and sentenced Sutton to death. *Dellinger*, 79 S.W.3d at 465–66 (citing Tenn. Code Ann. § 39–13–204(i)(2)). The Tennessee Court of Criminal Appeals (TCCA) and the Tennessee Supreme Court affirmed Sutton's conviction and sentence. *Id.* at 503.

## B. Post-Conviction Proceedings

In 2003, Sutton filed a petition for post-conviction relief in the Circuit Court for Blount County, alleging *inter alia* that trial counsel rendered constitutionally deficient assistance at sentencing by failing to investigate and present evidence of Sutton's abusive childhood. The trial court denied relief, and the TCCA affirmed. The TCCA summarized Sutton's mitigation evidence as follows:

> At sentencing, the defense presented the majority of its evidence through the testimony of Dr. Engum. . . . Concerning the petitioner's background, Dr. Engum testified that his interviews of the petitioner and his family members

revealed that the petitioner's father was an alcoholic, which "set the stage" for the petitioner to become an alcohol abuser by age twelve. He noted that the petitioner came from a broken home and that both parents subjected the petitioner to "mind games" and tried to bribe him to live with one parent over the other. He said the petitioner had endured physical and mental abuse and characterized him as "one of the least favored of all the children" in the family. He said the petitioner's "extremely poor" academic record, culminating in the petitioner's quitting school in the eighth grade, was not unexpected given his life in a "highly dysfunctional" and "chaotic family background." In summary, Dr. Engum described the petitioner's family background as "fairly deplorable."

Asked to describe the petitioner as an individual, Dr. Engum testified that the petitioner learned to distrust others from a young age and that his "self-protective mechanism" led to feelings of social isolation, aloneness, and depression. He said the petitioner used alcohol as well as marijuana as a form of self-anesthesia to lessen his pain. He said the petitioner was easily manipulated and became a follower, especially of persons older and more experienced than he was.

*Sutton v. State*, No. E2004-02305, 2006 WL 1472542, at *22–23 (Tenn. Crim. App. May 30, 2006). Applying the well-established standard from *Strickland v. Washington*, 466 U.S. 668, 686–87 (1984), the TCCA rejected Sutton's ineffective-assistance claim, reasoning:

[T]he record before us does not support [Sutton's] assertion that counsel wholly failed to investigate his background and were thereby prevented by a lack of awareness from presenting any mitigating proof of his social and family history. The record indicates that counsel relied on information provided by their expert psychologist together with the information counsel gained from personally interviewing dozens of witnesses in deciding which information to present to the jury. Although counsel might have chosen to place greater emphasis on certain negative aspects of his background, the jury was certainly made aware of the petitioner's abuse and neglect, alcoholism, drug abuse, lack of education, limited intelligence, and tendency to be influenced by others. In short, the record supports the trial court's finding that much of the evidence the petitioner presented at the post-conviction hearing was cumulative and only 'expanded' the evidence presented at trial.

At sentencing, the state relied on the petitioner's prior violent felony convictions in support of a sentence of death. Our supreme court has stated that the prior violent felony aggravating circumstance is "more qualitatively persuasive and objectively reliable than others." *State v. McKinney*, 74 S.W.3d 291, 313 (Tenn. 2002); *State v. Howell*, 868 S.W.2d 238, 261 (Tenn. 1993). In our view, this aggravating factor was all the more persuasive and difficult to overcome in the petitioner's case considering the fact that one of the petitioner's

> prior violent felony convictions was for the murder of the victim's sister. We are unpersuaded that being presented with more details or specific instances of the petitioner's abuse and neglect or his relationship with Dellinger would have led the jury to reach a different sentencing decision. Counsel's efforts to convince the jury not to return a sentence of death by emphasizing the petitioner's more positive attributes and by arguing that the petitioner's life had some value and should be spared despite his convictions were not unreasonable or uninformed. The fact the strategy was not successful does not, alone, establish that counsel were ineffective in preparing or presenting his case in mitigation.

*Id.* at \*24 (Tenn. Crim. App. 2006). In sum, the court found neither deficient performance nor prejudice under *Strickland*. *Id.* at \*24.

During the pendency of that appeal, the state Board of Medical Examiners revoked Dr. Harlan's medical license and released findings that he had engaged in improper forensic practices dating back to 1995. On the heels of this revelation, Sutton filed a motion with the TCCA to remand his post-conviction proceeding to the trial court for an evidentiary hearing on whether the prosecution suppressed impeachment evidence—i.e., information related to the state's investigation of Dr. Harlan—in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). After ordering the state to respond, the TCCA denied the remand motion, concluding that Sutton failed to present a "sustainable claim that the state suppressed the evidence or a reasonable probability that, armed with impeaching evidence against Dr. Harlan, the outcome of the trial would have been different."

In 2007, Sutton filed a habeas petition in federal court pursuant to 28 U.S.C. § 2254, attacking his conviction and sentence on twenty-five grounds, including the *Strickland* and *Brady* claims detailed above. Though the district court ultimately rejected all claims and denied the petition, it held an evidentiary hearing on the *Brady* claim pertaining to the prosecution's knowledge of the investigation of Dr. Harlan's professional misconduct. Finding no proof that members of the prosecution team knew or should have known of the investigation, the court

rejected Sutton's claim that the state suppressed favorable evidence. The court granted a certificate of appealability on the *Brady* and *Strickland* claims, and we expanded the ineffective-assistance claim to encompass Sutton's assertion that trial counsel should have presented evidence of Dellinger's corrupting influence at sentencing. Sutton appeals.

II.

The district court exercised jurisdiction under 28 U.S.C. § 2254, and we have appellate jurisdiction to review its final decision under 28 U.S.C. § 1291. We review the district court's legal conclusions de novo and its factual determinations for clear error. *Awkal v. Mitchell*, 613 F.3d 629, 638 (6th Cir. 2010) (en banc).

*A. The AEDPA Standard*

The parties agree that the deferential standard of review imposed by § 2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies to the ineffective-assistance claim. This provision constrains federal habeas review of claims "adjudicated on the merits in State court," such that federal courts may grant relief only if the state court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). AEDPA also accords a rebuttable presumption of correctness to a state court's factual determinations. *Id.* § 2254(e)(1).

The parties presume, however, that AEDPA deference does not apply to the *Brady* claim, despite the fact that the TCCA ostensibly addressed the merits of that claim in denying Sutton's motion to remand. If that ruling constituted a decision "on the merits," then it receives AEDPA deference, and we must confine our review to the record considered by the state court. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

The district court did not have the benefit of *Cullen v. Pinholster* in January 2010 when it granted an evidentiary hearing on the *Brady* claim. The court also bypassed the AEDPA-deference issue, concluding that the *Brady* claim failed under de novo review. This approach comes as no surprise; the state conceded that the TCCA's denial of the remand motion did not constitute a decision on the merits, waived exhaustion, and consented to an evidentiary hearing. Though the state's concession of the AEDPA-deference issue does not control, *see Moritz v. Lafler*, 525 F. App'x 277, 285 (6th Cir. 2013) (citing *Brown v. Smith*, 551 F.3d 424, 428 n.2 (6th Cir. 2008)), we need not resolve this unbriefed issue because we agree with the district court that the *Brady* claim fails under the more lenient de novo standard, *see Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (explaining that courts may deny habeas relief under § 2254 "by engaging in *de novo* review when it is unclear whether AEDPA deference applies").

*B.* Brady *Claim*

In *Brady v. Maryland*, the Supreme Court held that the prosecution violates due process when it suppresses material evidence favorable to the accused, regardless of whether the prosecution acts in good faith. 373 U.S. at 87. The prosecution has an affirmative duty to disclose such evidence, and that "duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v.*

*Agurs*, 427 U.S. 97, 107 (1976) and *United States v. Bagley*, 473 U.S. 667, 676 (1985)). Due process also requires the prosecutor "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," and to disclose that evidence if material. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). A *Brady* claim consists of three elements: (1) exculpatory or impeaching material evidence; (2) willfully or inadvertently suppressed by the state; (3) resulting in prejudice. *Doan v. Carter*, 548 F.3d 449, 459 (6th Cir. 2008) (quoting *Strickler*, 527 U.S. at 281–82). Because the state concedes materiality, we focus on suppression and prejudice.

### 1. State's Duty to Discover & Suppression of Impeaching Evidence

Citing *Kyles*, Sutton argues that the prosecution had a constitutional duty to learn of the state's investigation into Dr. Harlan and to disclose that evidence, which he then could use to impeach Dr. Harlan's credibility as a time-of-death expert. The Supreme Court in *Kyles* held that the prosecution's failure to disclose exculpatory and impeaching evidence known to the police detectives assigned to the case constituted a *Brady* violation. *Kyles*, 514 U.S. at 441–52 (noting the detectives' knowledge of eyewitnesses' inconsistent and potentially self-incriminating statements). Sutton argues that the same type of non-disclosure occurred here, where members of the Tennessee Bureau of Investigation (TBI) investigated both his case and Dr. Harlan's misfeasance. Yet, Sutton offers no evidence that the *same* TBI agents or teams participated in both investigations. Thus, he asks us either to impute the knowledge of the TBI agents investigating Harlan to those working on Sutton's case, or to impose an affirmative duty on the prosecution to learn all potential witness credibility defects known by members of a cooperating government agency. As the district court recognized, no court has extended the prosecution's *Brady* obligations so far.

Though we have not addressed this specific theory before—attributing the knowledge of certain agents to the entire investigative agency—we have stated that "*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). Accordingly, we have rejected *Brady* claims premised on evidence possessed by uninvolved government agencies, *Goff v. Bagley*, 601 F.3d 445, 476 (6th Cir. 2010) (prosecutor had no duty to investigate the unrelated federal prosecution of a witness), as well as evidence possessed only by a cooperating witness, *Graham*, 484 F.3d at 416–17 (distinguishing the cooperating witness in that case from the police officers "acting on the government's behalf" in *Kyles*, explaining that the witness "remained an independent actor" with his own agenda).

Other circuits have similarly confined prosecutors' sleuthing duties to material information possessed by members of the prosecution team. *See, e.g.*, *Avila v. Quarterman*, 560 F.3d 299, 307–08 (5th Cir. 2009) (concluding that pathologist's exculpatory opinion could not be imputed to prosecution team, because he served only as an expert witness and did not play an active role in either the investigation or prosecution); *Moon v. Head*, 285 F.3d 1301, 1310 (11th Cir. 2002) (declining to presume Georgia prosecutor's knowledge of TBI investigation, in the absence of evidence that TBI worked with the Georgia prosecution team during the relevant investigation); *United States v. Morris*, 80 F.3d 1151, 1169–70 (7th Cir. 1996) (concluding that *Kyles* imposed no obligation on the prosecution to inquire into exculpatory information possessed by other federal agencies when those agencies played no part in the relevant investigation or prosecution); *see also United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (construing *Kyles* to mean that "[a]n individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case");

*United States v. Quinn*, 445 F.2d 940, 943–44 (2d Cir. 1971) (rejecting defendant's constructive-notice theory for imputing the knowledge of any government agent to the prosecutor).

We find instructive the Second Circuit's decision in *United States v. Locascio*, where the court declined to presume federal prosecutors' knowledge of reports prepared by FBI agents unaffiliated with the trial or underlying investigation. 6 F.3d 924, 949 (2d Cir. 1993). Like that court, "[w]e will not infer the prosecutors' knowledge simply because some other government agents knew about the report." *Id.*; *see also Avellino*, 136 F.3d at 255 ("[K]nowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case . . . would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'").

Here, the district court found that:

> the evidence to impeach Dr. Harlan was in the possession of TBI Special Agents G. Richard Wright, Roy Copeland, and Jim Taylor—TBI agents with no connection or involvement in the investigation of Petitioner's case. Petitioner has not offered, and the record does not contain, any evidence of a collaborative effort between TBI Agents Wright, Copeland, and Taylor and Petitioner's prosecution team. Indeed, the proof is to the contrary as the prosecutors in Petitioner's state criminal case aver they had no knowledge of any investigation into Dr. Harlan at the time he testified.

In response, Sutton stresses the egregiousness of Dr. Harlan's professional transgressions, but he does not dispute these essential facts. Nor does he present facts supporting the inference that the prosecution team should have known of the state's investigation of Dr. Harlan. He therefore shows neither government suppression of favorable evidence nor a violation of the duty to

discover "favorable evidence known to . . . others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437.

*2. Prejudice*

Even if the prosecution had a duty to discover Dr. Harlan's professional misconduct, Sutton suffered no prejudice. Sutton admits that the prosecution's questioning "destroyed" his only time-of-death evidence: the expert testimony of Dr. Wolfe, a local general practitioner. Indeed, during cross-examination, Dr. Wolfe conceded that he lacked qualifications to make time-of-death determinations. Notably, the state successfully undermined Dr. Wolfe's testimony *before* it presented Dr. Harlan as a rebuttal witness.

The state also presented strong circumstantial evidence linking Griffin's murder to the night that Sutton and Dellinger bailed him out of jail. Two witnesses heard gunshots twenty-five minutes after Griffin's release into petitioner's custody, near the spot where Griffin's body would be found two days later. No one saw Griffin during the intervening period, despite the burning of his residence—a fact emphasized by the Tennessee Supreme Court in denying Dellinger's actual-innocence claim. *See Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) ("If Griffin were alive, it is improbable that no one would have been in contact with him during that time, especially considering that his home had burned down and his family was looking for him."). This, combined with the evidence of the road-side fight, the proximity of Dellinger's truck to Griffin's trailer at the time of the fire, forensic analysis of the shells found near the body, and the repeated attempts to bail Griffin out of jail, provided sufficient evidence for the jury to conclude that Sutton and Dellinger murdered Griffin on the evening of February 21, 1992.

Though prejudice for a *Brady* claim demands less than a sufficiency-of-the-evidence analysis, it still requires a "'reasonable probability' of a different result"—i.e., a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434–35 (quoting *Bagley*, 473 U.S. at 678). Sutton fails to show such a reasonable probability, where the impeaching evidence would have hurt the credibility of the government's rebuttal time-of-death witness—presuming the government still chose to call Dr. Harlan to the stand—but would have done nothing to undermine the remainder of the government's case. We have no reason to believe that the jury could have reached a different verdict had the parties known about the investigation of Dr. Harlan.

## C. *Ineffective-Assistance Claim*

Sutton's certified ineffective-assistance claim targets counsel's failure to investigate and present additional social-history evidence pertaining to Sutton's abusive childhood and Dellinger's corrupting influence. Relying on the post-conviction testimony of Dr. Pamela Auble, Sutton lists a number of abusive incidents that he believes counsel should have discovered and introduced in mitigation. These include abandonment by his mother, repeated physical abuse by a mentally unstable step-mother, and exile from the family home by his father, who sided with the step-mother. This neglect, he argues, made him vulnerable to the corrupting influence of Dellinger, the uncle who, at different points in Sutton's childhood and adolescence, introduced him to alcohol, routinely removed him from school, took him to Georgia while fleeing criminal charges, and fired shots at his car.

Under *Strickland*, a Sixth Amendment ineffective-assistance claim requires a showing of both (i) constitutionally deficient performance by counsel and (ii) prejudice, defined in the capital-punishment context as a reasonable probability that, but for counsel's errors, the sentencer would have chosen a different penalty. 466 U.S. at 687–94, 697. "The standards created by Strickland and [AEDPA] are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks and citations omitted). Thus, in reviewing Sutton's ineffective-assistance claim, we decide "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

The TCCA found both *Strickland* elements wanting. Rejecting Sutton's deficient-performance argument, the court pointed out that "the jury was certainly made aware of the petitioner's abuse and neglect, alcoholism, drug abuse, lack of education, limited intelligence, and tendency to be influenced by others," and found that counsel made the strategic decision to emphasize Sutton's positive attributes. *Sutton*, 2006 WL 1472542, at *24. The court noted that "counsel relied on information provided by their expert psychologist together with the information counsel gained from personally interviewing dozens of witnesses," and dismissed Sutton's additional evidence as mostly "cumulative." *Id.* "The fact that the strategy was not successful does not, alone, establish that counsel were ineffective in preparing or presenting his case in mitigation." *Id.* As for prejudice, the court found that Sutton's additional conviction for murdering Connie Branam undermined his assertion that additional evidence of his family history would have produced a different outcome. *Id.*

Sutton faults the state court for erroneous factual findings and argues that the court unreasonably applied *Strickland* and two other cases articulating counsel's duty to investigate mitigating circumstances, *Williams v. Taylor* and *Wiggins v. Smith*. We disagree on both fronts.

*1. Unreasonable Determinations of Fact*

First, Sutton contends that the state court misconstrued lead trial counsel's post-conviction testimony that he interviewed dozens of witnesses, overlooking the admission that he limited his investigation to positive character witnesses. But the portion of counsel's testimony cited by Sutton admits no such thing. Rather, it states:

> [F]or the family review, we were able to secure the free services of a . . . College senior . . . . And she worked under the tutelage of Dr. Engum and myself to interview prospective character witnesses and things of that nature, the family profile.

Counsel then provided examples of witnesses who spoke of Sutton's good deeds—hardly an admission that the defense team never investigated Sutton's background. Dr. Engum's sentencing testimony about Sutton's broken home and abuse—limited though it was—proves otherwise.[1] And so does Dr. Auble's testimony; as the TCCA noted, Dr. Auble "acknowledged that Dr. Engum had interviewed various family members" and that Dr. Engum's notes

---

[1]At sentencing, Dr. Engum characterized Sutton's childhood as being:

> [e]ssentially, a fairly deplorable family background. I guess the most significant aspect of his family background is a father who was basically a chronic alcoholic. This kind of set the stage for Gary himself to become an alcohol abuser by age twelve. Mother and father were divorced fairly early. There were indications, from interviewing both Mr. Sutton as well as other family members, that there was a lot of—I don't want to use the word competition, but a lot of attempts to bribe Gary by one parent or the other to try to cause Gary to live with either the father or the mother. Gary was subjected to a lot of mind games, a lot of head games. There's also indications in the record of quite a bit of physical and mental abuse, and a certain sense that—it was at least felt by some family members that Gary was one of the least favored of all the children.

"indicated that he was aware that family members, including Dellinger, had exposed [Sutton] to alcohol and prostitutes and that the petitioner's father had once locked him out of the house and made him stay in a dog house." *Sutton*, 2006 WL 1472542, at *7. This evidence sustains the TCCA's finding that "counsel relied on information provided by their expert psychologist together with the information counsel gained from personally interviewing dozens of witnesses in deciding which information to present to the jury." *See Sutton*, 2006 WL 1472542, at *24.

Resisting this conclusion, Sutton argues that we can infer counsel's ignorance of Sutton's abusive childhood from his failure to request a jury instruction concerning abuse and a stray remark about Sutton's parents "vying" for his attention during counsel's argument to the jury. Such speculation, however, does not overcome the state court's presumptively correct (and substantiated) factual conclusion that the defense team knew of and presented evidence of Sutton's deplorable childhood. *See* 28 U.S.C. § 2254(e)(1).

Next, Sutton takes issue with the TCCA's statement summarizing witness testimony that he "lived in a filthy house where he was verbally and physically mistreated by an unstable stepmother for one to two years," *Sutton*, 2006 WL 1472542, at *23, when, in fact, he lived with the woman from the age of six into his teenage years. The TCCA attributed this fact to the testimony of Sutton's brother, *id.* at *7, but we cannot confirm it in the record on appeal. Regardless, this slight misstatement of fact did not affect the state court's decision; the court detailed his stepmother's abuse and Dellinger's corrupting influence, reflecting its understanding of the evidence Sutton claimed counsel should have presented. *See id.*

In sum, Sutton has not shown that the TCCA's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

## 2. *Unreasonable Application of Law*

We turn now to the main thrust of Sutton's argument: that the TCCA unreasonably applied *Strickland*, *Williams*, and *Wiggins*.

Sutton challenges lead defense counsel's diligence on a number of fronts, stressing his lack of experience in capital sentencing proceedings; the minimal time billed specifically for sentencing preparation (five hours), half of which occurred after the verdict; and his reliance on Dr. Engum, whose records lack details of the investigation into Sutton's family background. In short, Sutton argues that, with a more thorough investigation, counsel would have presented more evidence of Sutton's abusive upbringing that may have persuaded the jury to spare his life.

Still, as noted above, the TCCA found that the defense team had access to evidence of Sutton's abusive childhood, as demonstrated by Dr. Engum's sentencing testimony about Sutton's broken home, alcoholism, distrust of others, and manipulability. *See Sutton*, 2006 WL 1472542, at *22–23. And the TCCA rejected Sutton's prejudice argument, finding that the aggravating circumstance of Branam's murder still would have outweighed any additional mitigating evidence. Thus, the real question is whether the defense should have discovered more specific instances of abuse and devoted more attention to that subject and to Dellinger's influence in its presentation to the sentencing jury. In the absence of clearly established Supreme Court precedent requiring additional investigation under similar circumstances, a fairminded jurist could conclude that the defense team satisfied the constitutional requirement. *See*

*Harrington*, 562 U.S. at 103 (explaining, under § 2254(d)(1), that the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"); *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003) (stressing that AEDPA's "unreasonable application" prong reaches only "objectively unreasonable" state court decisions, not incorrect ones).

*Williams* and *Wiggins* do not compel a contrary conclusion. The TCCA distinguished these cases as addressing the situation where "counsel wholly failed to investigate [the defendant's] background and were thereby prevented by lack of awareness from presenting any mitigating proof of . . . social and family history." *See Sutton*, 2006 WL 1472542, at *24. Sutton argues that this narrow reading distorts *Williams* and *Wiggins*, both of which found deficient performance and prejudice. But the TCCA reasonably concluded that counsel's performance surpassed the constitutionally deficient assistance in those cases.

In *Williams*, counsel failed to investigate several key mitigating circumstances, including Williams's "nightmarish childhood," borderline mental capacity, and prison records documenting his good behavior. *Williams*, 529 U.S. at 395–96. These oversights occurred:

> not because of any strategic calculation but because [counsel] incorrectly thought that state law barred access to such records. Had they [investigated], the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

*Id.* at 395. In view of the "comparatively voluminous amount of evidence" missed, the Court

held that "trial counsel did not fulfill their obligation to conduct a thorough investigation of the

defendant's background." *Id.* at 396.

In *Wiggins*, counsel presented no family-history evidence at sentencing. *Wiggins*,

539 U.S. at 516. Viewing skeptically counsel's strategy to forgo mitigation, the Court noted that

counsel limited its investigation of the defendant's life history to the presentence investigation

report and a handful of social services records documenting Wiggins's foster care placements.

Counsel also declined funds offered by the public defender's office to obtain a forensic social

worker. *Wiggins*, 539 U.S. at 523–24. The Court found that counsel's conduct fell below

Maryland and ABA standards for capital defense work, explaining that:

> The scope of their investigation was . . . unreasonable in light of what
> counsel actually discovered in the [social services] records. The records revealed
> several facts: Petitioner's mother was a chronic alcoholic; Wiggins was shuttled
> from foster home to foster home and displayed some emotional difficulties while
> there; he had frequent, lengthy absences from school; and, on at least one
> occasion, his mother left him and his siblings alone for days without food. As the
> Federal District Court emphasized, any reasonably competent attorney would
> have realized that pursuing these leads was necessary to making an informed
> choice among possible defenses, particularly given the apparent absence of any
> aggravating factors in petitioner's background.

*Id.* at 525.

Here, as stated above, counsel testified that he relied on information provided by Dr.

Engum and a college student to get a better understanding of Sutton's family situation. He also

had group meetings with family members during his investigation of the case. Admittedly, the

short amount of time devoted to sentencing preparation gives pause, but as the district court

explained, counsel's earlier efforts overlapped somewhat with the penalty-phase preparation. As

noted above, the defense team presented mitigating evidence on a variety of subjects, including

Sutton's employment history, previous conduct as a prisoner, his fine reputation as a family man (including heroic acts), and his family background. The jury heard about his parents' divorce, his childhood abuse and "least favored" child status, his limited education and IQ, his alcoholism from an early age, and his tendency to follow others. Dr. Engum's notes demonstrated that the defense team knew of Dellinger's corrupting influence during Sutton's childhood and of abuse by Sutton's father. And, to the extent Sutton argues that counsel should have argued that Dellinger played a dominant role in the commission of the crime, he offers no evidence that Dellinger actually did take such a leadership role and thus fails to explain why counsel should have explored this mitigation theory.[2]

> *Strickland* teaches that:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690–91. Counsel could have focused more on Sutton's family background, but the TCCA reasonably distinguished *Williams* and *Wiggins* and determined that counsel investigated enough to make the strategic decision not to devote more attention to that subject. *Cf. Bobby v. Van Hook*, 558 U.S. 4, 9–11 (2009) (per curiam) (rejecting *Strickland* claim where counsel

---

[2]Sutton points to three actions in arguing that Dellinger controlled their encounters with Griffin: Dellinger ordered the beer at the bar, he hid the gun in his trailer, and he posted Griffin's bond. None supports Sutton's claim that he followed Dellinger's lead in a crime that both denied committing.

presented considerable mitigating evidence from the petitioner's traumatic childhood, including beatings, alcoholism, and violent tendencies).

And even if counsel's performance fell below the constitutional standard, Sutton fails to show prejudice under AEDPA. No doubt, the additional social-history evidence adduced during post-conviction proceedings paints a more vivid and harrowing picture of Sutton's childhood abuse. But the state court reasonably concluded that the new evidence complemented Dr. Engum's less-detailed testimony on the subject and, thus, was largely cumulative. The evidence Sutton now presents illustrates the abuse that Dr. Engum alluded to in describing Sutton's "deplorable" childhood, but breaks no new ground. Further undermining Sutton's prejudice argument, Dr. Auble informed the state court that "evidence of a negative childhood ha[s] some, but 'not a great deal' of impact on jurors." *Sutton*, 2006 WL 1472542, at *6. Finally, the TCCA reasonably relied on state-court precedent that emphasizes the persuasive force of additional violent felony convictions. *Id.* at *24 (citing *State v. McKinney*, 74 S.W.3d 291, 313 (Tenn. 2002); *State v. Howell*, 868 S.W.2d 238, 261 (Tenn. 1993)). The U.S. Supreme Court acknowledged the strength of such a counterweight in its prejudice analysis in *Wong v. Belmontes*, 558 U.S. 15, 25–26 (2009) (referring to the additional murder conviction as the "elephant in the courtroom"). In light of Sutton's additional conviction for murdering Connie Branam, the TCCA could reasonably conclude that the absence of evidence detailing specific instances of abuse and corruption by Dellinger did not cast doubt on Sutton's death-sentence under *Strickland*'s reasonable-probability standard.

D.  *Uncertified Ineffective-Assistance Claim: Trial Counsel's Time-of-Death Strategy*

Sutton touches on another ineffective-assistance claim not certified for appeal: trial counsel's performance litigating the time-of-death issue during the guilt phase of trial. Our order of June 11, 2013, denied Sutton's request to certify this claim for appeal. Sutton argues that, under recent Supreme Court precedent, he may assert ineffective assistance of post-conviction counsel as a reason to supplement the record for his underlying ineffective-assistance claim. *See Trevino v. Thaler*, 133 S. Ct. 1911 (2013); *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Yet, as we stated in *Moore v. Mitchell*, *Martinez* provides a limited remedy for procedurally defaulted ineffective-assistance-of-trial-counsel claims, not an opportunity to expand the record when the state court denies such claims on the merits. 708 F.3d 760, 784–85 (6th Cir. 2013); *see also Martinez*, 132 S. Ct. at 1319–20 (characterizing its holding as a "limited" remedy for a procedural default); *Trevino*, 133 S. Ct. at 1921(extending *Martinez*'s procedural-default remedy to jurisdictions that, while technically allowing ineffective-assistance claims on direct appeal, provide no "meaningful opportunity" for those claims to be heard). To read *Martinez* and *Trevino* more expansively would undermine *Pinholster*'s conclusion that AEDPA limits federal-court review of habeas claims to the record established in state court. *Moore*, 708 F.3d at 785; *see also Pinholster*, 131 S. Ct. at 1398.

Sutton acknowledges that the TCCA rejected this uncertified time-of-death ineffective-assistance claim on the merits. *Sutton*, 2006 WL 1472542, at *20. In the absence of procedural default, *Martinez* and *Trevino* have no application. We therefore have no occasion to reconsider excluding this ineffective-assistance claim from the certificate of appealability.

III.

For these reasons, we AFFIRM.