NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0364n.06

No. 21-5968

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Aug 09, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| JEREL COLEMON, as personal representative of William R. Virgil, deceased, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| v. | ) ) ) | |
| CITY OF CINCINNATI and STEVE DANIELS, Norwood Police Officer, | ) ) ) | OPINION |
| Defendants-Appellees. | ) ) | |

Before: GRIFFIN, STRANCH, and DAVIS, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** In 2016, a Kentucky court vacated William Virgil's 1988 murder conviction based on new DNA evidence. A grand jury declined to reindict him, and Virgil was released after 28 years in prison. Virgil brought state and federal claims against the police officers who investigated his case and the three cities that employed them: Newport, Kentucky; Norwood, Ohio; and Cincinnati, Ohio. After discovery, the officers and cities moved for summary judgment. The district court partially denied the City of Newport's and the Newport officers' motions for summary judgment, but granted summary judgment to Norwood, Cincinnati, and those cities' officers as to all claims against them. Virgil now appeals the grant of summary judgment as to his *Brady* claim against Norwood police officer Steve Daniels and as to his *Monell* claim against the City of Cincinnati.[1]

---

[1] Virgil died during this appeal and Jerel Colemon, Virgil's relative and the representative of his estate, was substituted as his personal representative in the action. This opinion continues to refer to the Appellant as "Virgil."

## I.  FACTUAL BACKGROUND

On April 13, 1987, the body of 54-year-old Retha Welch, a psychiatric nurse in Cincinnati, Ohio, was found at her apartment in Newport, Kentucky.  A post-mortem investigation showed that she had been raped, stabbed twenty-eight times, and she suffered blunt force trauma to the head.  Defendant Newport police officers Marc Brandt, Norman Wagner, and Rick Sears led the initial investigation into Welch's murder, which identified 66 pieces of physical evidence from the crime scene that included fingerprints and a partial bloody palm print.  Investigators also noted that jewelry had been taken from the apartment and that Welch's pink Cadillac was missing.  Welch's car was discovered the next day in Covington, Kentucky.

Welch knew several former prisoners, including Virgil, through a jail ministry program with which she volunteered.  After Virgil's January 1987 release from prison, Welch helped him secure housing and stayed in touch, assisting him with tasks like laundry.  Welch's ex-boyfriend tentatively identified Virgil as a man that he had seen at Welch's apartment days before her death was discovered, and two of Virgil's past girlfriends implicated him in the crime.  One of his past girlfriends, Sue Daniels, told detectives that Virgil had asked her to help him murder Welch in a plot that included stealing her car and other personal property.  Daniels's probation officer confirmed to detectives that Daniels had previously approached him about a boyfriend who planned to commit a murder.  Another past girlfriend, Betty Kelow, told detectives that Virgil had asked her to help murder Welch because Welch had threatened to tell his parole officer that he had stolen her credit card.  Finally, a Newport officer secured a statement from Virgil's onetime cellmate, Joe Womack, that Virgil had confessed to Womack that he murdered Welch.

The Newport police identified additional suspects, including a man named Isaac Grubbs, who used a witness's phone to call Welch twice on April 11, 1987, and later that day was shot and killed in a police standoff. Two witnesses also reported that on April 11, they saw a man who matched Grubbs's description, but not Virgil's, driving, parking, and wiping down the surfaces of a pink Cadillac.

Simultaneously, Newport police investigated whether Welch's murder might be connected to two other homicides committed between February and April 1987: the murder of Valerie Wilton in Saint Bernard, Ohio, and the murder of Verlene Leon in Norwood, Ohio. Due to St. Bernard's limited resources, Cincinnati police were brought on to assist St. Bernard police with the Wilton murder investigation. Norwood Police Officer Steve Daniels led the Leon investigation.

On April 16, 1987, officers from Norwood, Newport, and St. Bernard met to discuss the three homicides; Cincinnati also acknowledges that its officers attended a meeting with Norwood, Newport, and St. Bernard on April 15, 1987. Notes from the April 16 meeting show that investigators compared details of the murder scenes and listed similarities including vaginal and anal penetration in all three homicides, bars of soap left in the bathroom sinks at the scene in the Welch and Leon murders, beer bottles at the scene in the Welch and Wilton murders, and cuts to the throat in the Wilton and Welch homicides. Newport officer Brandt testified that officers discussed whether there might be a common perpetrator of the homicides, a theory that he said he rejected.

After the initial meetings, the investigations proceeded, with Cincinnati police assisting Newport police with operations in Cincinnati. Cincinnati police helped Newport officers obtain and execute a search warrant on Virgil's father's home in Cincinnati. A Cincinnati police officer, Robert Cardone, obtained a search warrant in Cincinnati for Virgil's hair and blood. Cincinnati

officers also helped Newport officers locate a potential witness, Virgil's friend Karen Oglesby, in Cincinnati, and Cincinnati officer Cardone interviewed Oglesby with Newport police on April 22, 1987. A St. Bernard police officer, Kevin Condon, also interviewed Oglesby, and Oglesby gave Condon items of women's clothing that Virgil had given her. File notes show that Newport officer Wagner requested to take the clothes to be identified by Welch's daughter or ex-boyfriend, but at the time of his deposition, Wagner could not remember whether he took the clothes to be identified.

Officer Daniels of the Norwood police also acknowledges attending a meeting with other investigators to compare notes about the three murders. Afterward, Daniels communicated with St. Bernard officer Condon multiple times about the open homicide investigations in St. Bernard and Norwood. This included an April 20 call from Daniels to Condon, in which Daniels "advised that he would not go to the prosecutor's office," because "he couldn't contribute additional probable cause"; and a call from Daniels to Condon on April 23, in which Daniels asked to come to the St. Bernard police department to exchange more information. These calls appear to have been related to St. Bernard's investigation of the Wilton murder.

The St. Bernard police closed the Wilton investigation after a person named Hiram Hyden committed suicide on April 27, leaving a note that confessed to Wilton's murder. Potentially relevant to the Welch investigation, Hyden had received psychiatric treatment in April 1987, before Welch's death, at the hospital where she worked. Although no one has ever been charged in the Leon homicide, the Leon investigative file identified a person named "Danny Staudt" as a primary suspect based on a lie detector test.

The Kentucky prosecutor eventually secured an indictment against Virgil. At trial, the Commonwealth relied on circumstantial evidence including testimony from Womack that Virgil had confessed to him.[2] The jury found Virgil guilty and sentenced him to 70 years in prison.

In 2015, Virgil was released and granted a new trial after DNA testing indicated his innocence: DNA testing from the victim's vaginal swab excluded Virgil as a contributor, DNA testing showed with reasonable certainty that blood found on Virgil's clothing did not belong to Welch, and that hairs recovered at the crime scene were not Virgil's. In 2016, Womack recanted his testimony and revealed that it had been fabricated and coerced by Newport police. A grand jury declined to reindict Virgil in 2017.

In 2016, Virgil sued thirteen officers and the cities of Newport, Norwood, and Cincinnati, alleging multiple constitutional violations and state law tort claims. After discovery, all defendants moved for summary judgment. The district court granted the motions for summary judgment of the individual Cincinnati and Norwood officers, finding that they had no duty under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose favorable evidence to Virgil, and likewise granted summary judgment to the City of Cincinnati on Virgil's claim under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), reasoning that there was no underlying *Brady* violation by the City's officers.[3] Virgil voluntarily dismissed his claims against the individual Cincinnati officers at summary judgment. The district court also concluded that Virgil abandoned

---

[2] Among others, the Commonwealth identified Cincinnati Officer Mike Phillips as a fact witness at trial. The court records supporting Phillips's designation as a witness were not before the district court or initially submitted on appeal. Virgil has asked us to take judicial notice under Federal Rule of Evidence 201 of the fact that the Commonwealth identified Phillips as a fact witness. Because this information is not necessary to our analysis, we deny the motion as moot.

[3] The district court also denied summary judgment to two Newport officers and the City of Newport. After briefing was completed in the Newport officers' parallel appeal of the district court's denial of qualified immunity, Virgil and the Newport defendants reached a settlement and voluntarily dismissed the appeal.

his *Monell* claim against the City of Norwood because his summary judgment brief did not discuss it; Virgil does not contest this holding on appeal.

## II.  ANALYSIS

A district court's grant of summary judgment is reviewed de novo.  *Wesley v. Campbell*, 779 F.3d 421, 434-35 (6th Cir. 2015).  Summary judgment is appropriate here if, construing the evidence and reasonable inferences in Virgil's favor, Cincinnati and Officer Daniels are entitled to judgment as a matter of law.  *See id.*; Fed. R. Civ. P. 56(a).

Two questions remain in this appeal: (1) whether Officer Daniels violated Virgil's clearly established due process rights under *Brady*; and (2) whether the City of Cincinnati had a "policy or custom" under *Monell* that caused Cincinnati police officers to violate Virgil's due process rights under *Brady*.  Both issues require the Court to address whether officers—the Cincinnati police and/or Officer Daniels—violated *Brady* by withholding evidence developed during their investigation into whether Welch's homicide was connected to the Wilton and Leon murders. Because Cincinnati officers and officer Daniels had different levels of involvement in the interjurisdictional investigation, and because Daniels asserts a qualified immunity defense, we separately evaluate Virgil's claims against the City of Cincinnati and Officer Daniels.

### A.     The City of Cincinnati

Although § 1983 may be exercised against a municipality, "liability attaches only under a narrow set of circumstances[,]" and a municipality may not be held liable solely for employing a tortfeasor. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019).  "Instead, a plaintiff must show that 'through its deliberate conduct, the municipality was the moving force behind the injury alleged.'" *Id.* (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).  For municipal liability under *Monell*, Virgil must establish that Cincinnati had a "'policy or custom' that caused

the violation of his rights." *Id.* (quoting *Monell*, 436 U.S. at 694). A plaintiff may demonstrate that a city had such a policy or custom in four ways: "the plaintiff may prove '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'" *Id.* (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). Virgil proceeds with the theory that Cincinnati had a policy of inadequate training on *Brady* obligations.

Although Virgil continues to allege that Cincinnati is liable for violations of his rights by its officers, he has voluntarily dismissed his *Brady* claim against the individual officers themselves. Supreme Court and Sixth Circuit precedent holds that a constitutional *injury* is required to pursue a *Monell* claim. *See City of L. A. v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *D'Ambrosio v. Marino*, 747 F.3d 378, 391 (6th Cir. 2014). But "[i]t is undecided whether a municipality's liability under § 1983 is predicated on first finding that an individual officer or employee is also liable." *Rayfield v. City of Grand Rapids*, 768 F. App'x 495, 511 n.12 (6th Cir. 2019). As we held in *Winkler v. Madison County*, municipalities "may be held liable under § 1983 in certain cases where no individual liability is shown," including when the municipality itself directly caused the violation, or the violation was caused by a combination of government-sponsored conduct not easily traceable to one individual official, "where municipal liability is based on the actions of individual government actors other than those who are named as parties"—a situation that would be functionally similar to Virgil's voluntary dismissal of the individual government actors here. 893 F.3d 877, 899–901 (6th Cir. 2018) (quoting *Epps v. Lauderdale Cnty.*, 45 F. App'x 332, 334-35 (6th Cir. 2002) (Cole, J., concurring)). Our Circuit has previously determined a defendant municipality's *Monell* liability by evaluating only a non-party's actions, suggesting that a party's

liability is not required, as long as the court finds a constitutional violation occurred. *Andrews v. Wayne Cnty.*, 957 F.3d 714, 725 (6th Cir. 2020); *see also Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993) (rejecting City's argument that because the only defendant officer in the case had been dismissed by the district court, the City should also be dismissed).

But we need not decide whether a municipality's *Monell* liability is always contingent on finding an individual defendant liable for a constitutional violation. As explained below, even assuming that Virgil may proceed with his § 1983 claim against the City of Cincinnati without also suing the individual Cincinnati officers, he has not presented facts from which a jury could find that the officers violated his due process rights under *Brady*. *See D'Ambrosio*, 747 F.3d at 391.

In *Brady*, the Supreme Court held that the prosecution violates due process when it suppresses material evidence that is favorable to the accused. 373 U.S. at 87. *Brady* violations are assessed using a three-part test: "The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently"; and, in what is sometimes called the materiality prong, "prejudice must have ensued." *United States v. Castano*, 906 F.3d 458, 466 (6th Cir. 2018) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Virgil argues that the Cincinnati officers violated *Brady* by failing to disclose the Wilton and Leon investigative files, which he argues included exculpatory evidence. In particular, he points to evidence of other suspects, including Hiram Hyden, and the fact that Virgil was "cleared" as a suspect in the Wilton and Leon murders.

Neither Cincinnati nor Daniels contest the district court's holding that the evidence related to the officers' joint investigation was exculpatory. Information about other "legitimate

suspect[s]" typically favors a defendant and must be disclosed under *Brady*. *D'Ambrosio v. Bagley*, 527 F.3d 489, 499 (6th Cir. 2008). Because the Cincinnati and Norwood officers investigated whether the murders in their jurisdictions were linked with Welch's murder, the district court correctly reasoned that any suspects developed during that period would also be considered suspects in Welch's murder, and the fact that Virgil was cleared as a suspect in the Wilton and Leon murders would tend to exculpate him from the Welch murder.

With respect to *Brady*'s second prong, however, the parties dispute whether the Cincinnati officers had a duty to disclose exculpatory information to the Kentucky prosecutor. Police investigating a case generally do have *Brady*-derived duties to disclose exculpatory information. Although *Brady* imposes an absolute disclosure obligation only on prosecutors, "the police bear . . . an equally important '*Brady*-derived' responsibility to turn over potentially exculpatory evidence to the prosecutor's office." *Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009) (quoting *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) and reasoning that "there is no doubt that the police are just as capable of depriving criminal defendants of a fundamentally fair trial by suppressing exculpatory evidence."). When the exculpatory value of evidence is "apparent" to police, the police have a "constitutional duty to preserve and ultimately disclose that evidence." *Id.* at 388. Unlike the prosecutor, who must disclose exculpatory evidence directly to the defendant, police officers typically discharge their *Brady* duty by disclosing exculpatory evidence to the prosecutor in their jurisdiction. *Id.* at 379-80.

The interjurisdictional nature of this dispute raises a question of first impression: whether a *Brady* disclosure obligation extends to investigating officers in a non-prosecuting jurisdiction when they work together with police in the prosecuting jurisdiction. *Brady* obligations are generally understood to extend to information possessed by "the law enforcement agency

investigating the offense," *Jamison v. Collins*, 291 F.3d 380, 385 (6th Cir. 2002), but they also require a prosecutor "to learn of any favorable evidence known to the others acting on the government's behalf in the case," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), indicating that joint investigators may sometimes incur a *Brady* duty.

When that duty applies is less clear. Sixth Circuit precedent suggests that *Brady*'s application to an officer from a non-prosecuting jurisdiction depends on the level of the jurisdiction's involvement in the joint investigation. For instance, we concluded in *Sutton v. Carpenter* that Brady claims cannot be sustained based on evidence possessed by "*uninvolved* government agencies," indicating that agencies that are sufficiently involved in an investigation do have a *Brady* duty. 617 F. App'x 434, 441 (6th Cir. 2015) (emphasis added). *Sutton* also noted that prosecutors have "sleuthing duties" as to "material information possessed by members of the prosecution team," *id*, which at its core includes prosecutors and police who perform investigative duties and make strategic decisions about the case's prosecution, *see, e.g.*, *Kyles*, 514 U.S at 437-38. The Supreme Court's clarification in *Kyles* that the prosecution team may include "others acting on the government's behalf" supports the proposition that a *Brady* duty can also apply to another jurisdiction's officers who participate in investigative duties and strategic decision making. *Id.* at 437.

Indeed, as courts increasingly confront cross-jurisdictional investigations, many have analogously held that the relevant inquiry for imputing knowledge of *Brady* material from extra-jurisdictional actors to a prosecutor is the level of involvement between the prosecuting and non-prosecuting jurisdictions. Although our Circuit has not addressed this question directly, some courts have examined the "extent to which there was a joint investigation with another agency," considering factors including whether one agency acts on another's behalf or under its control and

the extent to which the agencies work as a team and share resources. *United States v. Ellison*, 527 F. Supp. 3d 161, 166 (D.P.R. 2021) (quoting *United States v. Ramos-Cartagena*, 9 F. Supp. 2d 88, 91 (D.P.R. 1998)); *see also United States v. Risha*, 445 F.3d 298, 304-05 (3d Cir. 2006) (collecting cases). Other courts have taken a comprehensive, fact-based approach, examining factors including whether there was jurisdictional overlap regarding the control or direction of an investigation, whether the case was ever considered a joint investigation with another agency, whether the officer in question was under the prosecutor's authority or control, and whether the officer participated in developing a case for trial. *See Stano v. Butterworth*, 51 F.3d 942, 946 (11th Cir. 1995); *see also United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979).

The district court concluded that our decision in *Rimmer v. Holder*, 700 F.3d 246 (6th Cir. 2012), precluded the application of a *Brady* duty to a non-prosecuting jurisdiction. In *Rimmer*, the FBI and state law enforcement investigated a defendant's case but only the state prosecuted him. *Id.* at 250. The defendant later filed a Freedom of Information Act (FOIA) request for FBI documents, and we determined that the federal government had no *Brady* duty because it had not prosecuted Rimmer, and because he had failed to provide evidence "showing that the FBI somehow used its status as a joint investigator to shield exculpatory information from Rimmer." *Id.* at 259. *Rimmer* emphasized that, rather than segregate the exculpatory evidence in its own files, the FBI had "ensur[ed] that [the evidence] would be subject to *Brady* in the event of a state prosecution" by turning it over to state police. *Id*.

*Rimmer* arose out of a FOIA dispute and did not address a freestanding *Brady* claim; instead, it asked whether a public interest in the revelation of wrongdoing by the government might justify the documents' disclosure. The case therefore does not control on the question of *Brady*'s application to a non-prosecuting jurisdiction. *Rimmer* is persuasive, however, as to its reasoning

that for *Brady* to apply to a government actor from a non-prosecuting jurisdiction, a plaintiff must show that the non-prosecuting jurisdiction's status as a joint investigator was somehow used to shield exculpatory information from the prosecuting jurisdiction. This makes sense. Where a prosecuting jurisdiction is in full possession of the exculpatory information possessed by police in the non-prosecuting jurisdiction, that information is subject to the *Brady* disclosure obligation of the police and the *Brady* investigation obligation of the prosecutor in the prosecuting jurisdiction. But where a *non*-prosecuting jurisdiction shields exculpatory information from the prosecuting jurisdiction, the *Brady* duty extends to require, at the least, that the exculpatory information be disclosed to police in the prosecuting jurisdiction.

Based on *Rimmer*'s indication that *Brady* may require a joint investigator to disclose exculpatory information to the prosecuting jurisdiction, two questions remain: (1) whether Cincinnati police were sufficiently involved in the Welch investigation to make them investigating members of the "prosecution team" to which a *Brady* duty applied; and (2) whether they discharged that *Brady* duty by disclosing the exculpatory information to the Newport police or prosecutor. We need not address the first question because the Cincinnati officers disclosed to the Newport police all the information to which Virgil points as exculpatory. The record shows that Newport officers Brandt and Wagner had meetings, phone calls, and other communications about the serial killer investigation and Virgil, and it establishes that they knew Wilton's name, Hyden's confession, and the fact that the investigation was closed ("clearing" Virgil as a suspect)—the only evidence from the Wilton investigation to which Virgil specifically points as exculpatory. Even assuming that a *Brady* obligation applied to the Cincinnati officers as joint investigators, they discharged any *Brady* obligation that applied.

An underlying constitutional violation is required to sustain a *Monell* claim. Because a reasonable jury could not find that the Cincinnati officers violated Virgil's due process rights under *Brady*, his *Monell* claim against the City also fails.

### B.    Norwood Officer Daniels

Officer Daniels raises a qualified immunity defense, which means that Virgil must show a genuine issue of material fact as to whether Daniels violated clearly established federal law. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). There are two steps to a qualified immunity analysis: the court must determine both that "the facts alleged show the officer's conduct violated a constitutional right" and that the right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). We may address either question first. *See Pearson*, 555 U.S. at 236. "Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010)).

Again, a *Brady* violation would require that Daniels was both sufficiently involved to be considered a part of the prosecution team and failed to disclose material exculpatory information gathered in that investigation to the prosecuting jurisdiction. *See Rimmer*, 700 F.3d at 259. Compared with the Cincinnati officers' contributions to Newport's investigation of Virgil, Officer Daniels' involvement in the joint investigation was relatively minimal. Although Daniels attended at least one interjurisdictional meeting in April 1987, and had several subsequent phone calls with St. Bernard police, Virgil fails to point to record evidence that Daniels had contact with the Newport police or prosecutor in any manner after that meeting.

The definition of "involvement" in an investigation is less than clear. Although some courts addressing the question have provided parameters for interjurisdictional *Brady* obligations,

those parameters are highly fact-specific and evaluated in the context of imputing knowledge from other non-prosecuting actors to the prosecutor. Virgil has failed to point to precedent that could have given Daniels notice that his level of involvement in the investigation was sufficient for *Brady* to apply. Therefore, even if Daniels had an obligation to disclose information collected in the Leon investigation, that obligation was not clearly established at the time of the alleged violation.

## III.   CONCLUSION

For these reasons, we **AFFIRM** the district court's grant of summary judgment to Cincinnati and Officer Daniels.